## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE CLAUDE WORTHINGTON                )
BENEDUM FOUNDATION,                    )
                                       )
            Plaintiff,                 )        2:19-cv-132
                                       )
     vs.                               )
                                       )
THE BANK OF NEW YORK                   )
MELLON, CORPORATION and                )
THE BANK OF NEW YORK                   )
MELLON,                                )
                                       )
            Defendants.                )

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Defendants' motion to dismiss is the second time the Court has been asked to weigh in on the legal sufficiency of The Claude Worthington Benedum Foundation's claims in this case. The first time, Benedum alleged that The Bank of New York Mellon Corporation (and an alleged "alter ego" entity) breached their fiduciary duties and committed fraud by failing to provide Benedum with "best pricing" and by making materially false statements about their "true pricing structure." The Court dismissed those claims but gave Benedum an opportunity to plead more facts in support of its fiduciary-duty claim stemming from alleged affirmative misrepresentations and omissions of material fact. Essentially, the Court needed more of Benedum's story before it could definitively decide whether that theory had legal merit.

The Court now has the story, and it's like the one Benedum told before. Benedum alleges that BNY Mellon breached its fiduciary duties by "affirmatively misrepresenting" its "pricing structure" and "concealing" the "true pricing structure" during the parties' attorney-conducted settlement

negotiations to resolve a dispute between them.   The problem for Benedum is that, even if its allegations are true, they are not enough to state a viable breach-of-fiduciary-duty claim, for at least two reasons.

First, BNY Mellon was not acting as Benedum's fiduciary when the parties were negotiating their settlement agreement.   For there to be fiduciary duties, there must be a "confidential relationship" between the parties.   That kind of relationship is marked by trust and reliance on one side, and a corresponding chance to abuse that trust on the other.   Here, at the relevant time, the parties were acting as direct adversaries in resolving potential litigation—pursuing separate agendas and receiving advice from separate legal counsel.   The contours of their pre-existing confidential investor-client relationship did not extend to that adversarial setting.   The kind of arm's-length bargaining at issue in this case cannot give rise to a confidential relationship and the corresponding fiduciary duties.

Second, the parol evidence rule bars the claim.   The parol evidence rule prevents Benedum from introducing into evidence any representations BNY Mellon made about pricing while negotiating the settlement agreement.   That is because the settlement directly addresses pricing and is a fully integrated agreement as to that term.   Those statements, however, are the only basis for Benedum's fiduciary-duty claim.   Without them, Benedum cannot plead a plausible claim.

Thus, the Court will grant BNY Mellon's motion and dismiss Benedum's second amended complaint with prejudice.

## BACKGROUND

### I.   Factual background.

Benedum entered into a custodian agreement with BNY Mellon's predecessor, Mellon Bank, N.A. ("Mellon Bank"), on July 18, 1977, in which

Benedum appointed Mellon Bank as its "attorney-in-fact." [ECF 33, ¶¶ 17-18]. The custodian agreement provides that Mellon Bank, as custodian, would hold certain property of Benedum and "shall invest, sell and reinvest only upon [Benedum's] directions." [ECF 33-1]. Later, in May 1993, Benedum entered into a trust agreement with Mellon Bank, which made Mellon Bank Benedum's trustee. [ECF 33, ¶ 19].

In 2004, Benedum placed $2 million in the Mellon HBV Offshore Multi-Strategy Fund Ltd. [*Id.* at ¶ 23]. Benedum alleges that BNY Mellon learned the fund was illiquid and troubled in 2007 but did not disclose that fact to Benedum. [*Id.* at ¶ 24].

In 2008, the fund collapsed, and Benedum lost its entire investment. [*Id.* at ¶ 25]. In June 2010, Benedum demanded the value of its lost investment from BNY Mellon. [*Id.* at ¶ 28]. The parties then began negotiating a settlement of that dispute. [*Id.* at ¶¶ 29-30]. During that negotiation, separate counsel represented the parties. [*Id.* at ¶ 26].

The counsel-negotiated settlement agreement had two compensation components: (1) a cash payment; and (2) a discount on fees charged by BNY Mellon moving forward. [*Id.* at ¶ 31]. For the discount, Benedum claims that BNY Mellon's counsel represented to Benedum's counsel that it would provide "the best rates that it was charging customers" to Benedum. [*Id.* at ¶ 34]. The rate BNY Mellon offered was 1.5 basis points for assets under management. [*Id.*]. BNY Mellon's counsel allegedly said that going lower would be providing services "below cost," which BNY Mellon refused to do. [*Id.* at ¶ 35].

Specifically, the second amended complaint alleges the following about the alleged misrepresentations made by BNY Mellon's counsel (identified as "AS" in the second amended complaint):

34.    On December 10, 2010, AS spoke to the Foundation's counsel.  During the course of that conversation, AS agreed that the Foundation would be provided the best rates that it was charging customers.  However, AS advised that a 2-basis point reduction across the board was not possible given that certain rates were already at their lowest.  Included among the rates that AS asserted were already at their best/lowest was the 1.5 basis points being charged to the Foundation on its assets under management.

35.    In advising that rates were at their best, AS advised that prices could not be provided "below cost."

[ECF 33, ¶¶ 34-35].

On April 7, 2011, the parties entered into the final settlement agreement.  The final agreement included a cash payment, a fee schedule that included the reduced 1.5 basis points fees, and an integration clause.  [ECF 23-1, ¶ 7].

Benedum alleges that in March 2018, it learned "for the first time that BNY Mellon was charging half the rate to other customers at 0.75 basis points compared to 1.5 basis points."  [ECF 33, ¶ 54].   In other words, Benedum alleges BNY Mellon had been charging lower custodial fees to other customers but were not providing them to Benedum and did not inform Benedum of their availability.  [*Id.* at ¶ 56].  Benedum also alleges BNY Mellon did not advise that the rates being charged to it before the reduction as part of the settlement were higher than those charged to other customers, and Benedum believed that BNY Mellon was providing it the best available pricing.  [*Id.* at ¶ 49].

According to Benedum, BNY Mellon had a "duty to disclose the true pricing, not only because it was the fiduciary of [Benedum], but also because of the affirmative representations made pertaining to the Settlement Agreement[.]"  [*Id.* at ¶ 52].  Benedum believes that "for at least a five-year

period, [it] was overcharged approximately $26,500 a year, estimated at a minimum of $131,000." [*Id.* at ¶ 65].

## II.   Procedural background.

Based on the above conduct, Benedum sued.  Soon after, BNY Mellon moved to dismiss and Benedum filed its first amended complaint in response. The first amended complaint contained fraud and fiduciary-duty claims.  BNY Mellon once again moved to dismiss, and the Court granted the motion.

In the first amended complaint, for its fraud claim, Benedum alleged that BNY Mellon misrepresented that it would provide "best pricing" for its services going forward during the parties' settlement negotiations.  *Claude Worthington Benedum Found. v. Bank of N.Y. Mellon Corp.*, 422 F. Supp. 3d 940, 943 (W.D. Pa. 2019) (Ranjan, J.) (citation omitted).  Benedum alleged that it only entered into the settlement agreement because it believed BNY Mellon's representation.  The Court held that this type of fraud claim was barred by the parol evidence rule because the settlement agreement contained an integration clause and was the "entire agreement" between the parties as to pricing.  *Id.* at 946-48.

Benedum argued that the parol evidence rule did not apply because it was bringing a claim for fraud in the execution, not fraudulent inducement. The Court disagreed because Benedum did not allege that a pricing term was omitted from the contract, but instead alleged that "it believed the pricing term represented something that it did not (*i.e.*, 'best pricing') based on BNY Mellon's characterizations."  *Id.* at 947.  Despite Benedum's label, that type of claim is for fraudulent inducement, and it is subject to the parol evidence rule under Pennsylvania law.  *Id.*  Finding that this claim could not be remedied by amendment, the Court dismissed it with prejudice.  *Id.* at 948.

As for its fiduciary-duty claim, Benedum alleged two bases: (1) BNY Mellon breached its affirmative duty to provide "best pricing" to Benedum; and (2) BNY Mellon breached its fiduciary duty by making false statements about its fee structure. *Id.* at 943-46.  The Court dismissed the claim under the first theory with prejudice finding that "the scope of [BNY Mellon's] fiduciary duty does not include a requirement to provide the 'best possible pricing' for its services." *Id.* at 944.

As for Benedum's second theory, the Court found that "[m]isrepresentations and omissions of material fact can serve as the basis for a breach of fiduciary duty claim," but that Benedum hadn't pled enough facts to support the claim. *Id.* at 945.  The Court therefore dismissed this aspect of Benedum's fiduciary-duty claim without prejudice and gave Benedum one final chance to provide the necessary detail to support its claim. *Id.* at 946.

Following the Court's decision, Benedum filed the second amended complaint and pled more facts about its remaining fiduciary-duty claim— specifically, the misrepresentations and communications by BNY Mellon's counsel, "AS," noted above.

BNY Mellon has now moved to dismiss the second amended complaint. After full briefing and oral argument, the Court is ready to decide the motion.

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.*  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal marks and citations omitted).

## DISCUSSION & ANALYSIS

### I.   Benedum's fiduciary-duty claim fails as a matter of law.

Benedum alleges that BNY Mellon breached its fiduciary duties by affirmatively misrepresenting its "pricing structure" and concealing its "true pricing structure when under an affirmative[] duty to reveal it." [ECF 33, ¶ 64]. This conduct occurred while the parties were settling a dispute over BNY Mellon's prior mishandling of its investment funds.

BNY Mellon argues that such a breach is impossible. According to BNY Mellon, "any representations that [BNY Mellon's] in-house counsel allegedly made during those negotiations were made outside the scope of any fiduciary obligations, and therefore cannot serve [as] the basis for a breach of fiduciary duty claim." [ECF 36, p. 6].

The Court agrees that Benedum does not state a viable fiduciary-duty claim. No one disputes that the parties had a confidential relationship related to BNY Mellon's investment and custody of Benedum's funds. The question is whether that relationship extended to when the parties later became adversaries. As to that specific context, the parties, in effect, had a different relationship. They were acting as equals, were represented by separate counsel, and were resolving a potential lawsuit through their attorneys. Finding a confidential relationship in that context would conflict with the parties' agreements and Pennsylvania law.

A. **The scope of the parties' confidential relationship did not extend to when they were engaged in settlement negotiations.**

To state a claim for breach of fiduciary duty under Pennsylvania law, a plaintiff must first establish that a confidential relationship existed between the parties. *Basile v. H&R Block, Inc.*, 761 A.2d 1115, 1119-22 (Pa. 2000). "The concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." *In re Estate of Scott*, 316 A.2d 883, 885 (Pa. 1974) (citation omitted). "The essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." *Basile v. H&R Block, Inc.*, 777 A.2d 95, 101 (Pa. Super. Ct. 2001) (cleaned up). In some cases, "as between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent, the existence of a confidential relationship is a matter of law." *Id.* at 102 (cleaned up). But in all others, confidential relations arise only based on the specific "facts and circumstances" of the parties' dealings. *Id.*

Once a confidential relationship is established, the plaintiff must then show "the defendant's failure to act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope of the confidential or fiduciary relationship." *MGM Auto. Grp., LLC v. Genuine Parts Co.*, No. 13-9, 2013 WL 967956, at *2 (W.D. Pa. Mar. 12, 2013) (Fischer, J.) (cleaned up). That is because a fiduciary must act in good faith for "all matters for which he or she was employed." *Dinger v. Allfirst Fin., Inc.*, 82 F. App'x 261, 265 (3d Cir. 2003) (cleaned up).

Based on those standards, there are three governing principles that guide the Court's analysis: (1) a fiduciary duty exists only when the parties are in a confidential relationship; (2) the nature and scope of the parties'

relationship depends on the context; and (3) the relevant offending conduct must occur within the scope of the confidential relationship.

In determining the existence and parameters of a confidential relationship here, the Court looks to the parties' agreements and Pennsylvania law.

Initially, as between a trustee and beneficiary, the trust document "defines and limits the trustee's duty to the beneficiaries." *Warehime v. Warehime*, 761 A.2d 1138, 1141 (Pa. 2000). Benedum agrees, alleging in the second amended complaint that Section 5 of the Trust Agreement sets forth BNY Mellon's fiduciary obligations in this case. [ECF 33, ¶ 20]. But these obligations all relate to, in one form or another, the investment of Benedum's funds. [ECF 33-2, § 5]. They do not concern the situation of negotiated dispute resolution between the parties. Specifically, Section 5 states:

<u>SECTION 5</u>

5.1   The Trustee is authorized and empowered, in addition to powers granted under the Probate, Estates and Fiduciaries Code of the Commonwealth of Pennsylvania, as amended, which statute, to the extent of its granting of powers applicable to trusts of a similar nature to this Trust, is incorporated herein by reference:

    (a)   to sell, exchange, convey, transfer or otherwise dispose of any property held in the Fund and to make any sale by private contract or public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency or propriety of any such sale or other disposition;

    (b)   to vote in person or by proxy any stocks, bonds or other securities held in the Fund, without any obligation to inquire as to or follow the wishes of the Company with respect to the voting of any such stocks, bonds or securities;

(c)     to exercise any rights appurtenant to any such stocks, bonds or other securities for the conversion thereof into other stocks, bonds or securities, or to exercise rights or options to subscribe for or purchase additional stocks, bonds or other securities, and to make any and all necessary payments with respect to any such conversion or exercise, or to write covered call option contracts on any such stocks, bonds or other securities, or to engage in any transaction in other forms of options which are directly related to a covered call option contract which the Fund has outstanding;

(d)     to join in, dissent from or oppose the reorganization, recapitalization, consolidation, sale or merger of corporations or properties of which the Fund may hold stocks, bonds or other securities or in which it may be interested,  upon such terms and conditions as deemed wise, to pay any expenses, assessments, or subscriptions in connection therewith, and to accept any securities or property, whether or not trustees would be authorized to invest in such securities or property, which may be issued upon any such reorganization, recapitalization, consolidation, sale or merger and thereafter to hold the same, without any duty to sell;

(e)     to make, execute, acknowledge and deliver any and all deeds, leases, mortgages, assignments, documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(f)     to cause any investment, either in whole or in part, in the Fund to be registered in, or transferred into, the Trustee's name or the names of a nominee or nominees, including but not limited to that of the Trustee, a clearing corporation, or a depository, or in book entry form, or to retain any such investment unregistered or in a form permitting transfer by delivery, provided that the books and records of the Trustee shall at all times show that such investments are a part of the Fund; and to cause any such investment, or the evidence thereof, to be held by the Trustee, in a depository, in a clearing corporation, in book

- 10 -

entry form, or by any other entity or in any other manner permitted by law;

(g)    to form corporations and to create trusts, to hold title to any security or other property, to enter into agreements creating partnerships or joint ventures for any purpose or purposes determined by the Trustee to be in the best interests of the Fund;

(h)    to insure against any contingency in any property held in the Fund for any amount and to pay any premiums required for such coverage;

(i)    to purchase or otherwise acquire and make payment therefor from the Fund any bond or other form of guarantee or surety required by any authority having jurisdiction over this Trust and its operation, or believed by the Trustee may not obtain any insurance whose premium obligation extends to the Fund which would protect the Trustee against its liability for breach of fiduciary duty;

(j)    to defend against or participate in any legal actions involving the Fund or the Trustee in the manner and to the extent it deems advisable, the costs of any such defense or participation to be borne by the Settlor, as provided for below;

(k)    to enter into any type of contract with any insurance company or companies, either for the purposes of investment or otherwise; provided that no insurance company dealing with the Trustee shall be considered to be a party to this Agreement and shall only be bound by and held accountable to the extent of its contract with the Trustee. The insurance company need only look to the Trustee with regard to any instructions issued and shall make disbursements or payments to any person, including the Trustee, as shall be directed by the Trustee. Where applicable, the Trustee shall be the sole owner of any and all insurance policies or contracts issued. Such contracts or policies, unless otherwise determined, shall be held as an asset of the Fund for safekeeping or custodian purposes only;

(l)    to appoint agents, custodians, depositories or counsel, domestic or foreign, as to part or all of the Fund and functions incident thereto where, in the sole discretion of the Trustee, such delegation is necessary in order to facilitate the operations of the Fund and such delegation is not inconsistent with the purposes of the Fund or in contravention of any applicable law. Upon such delegation, the Trustee may require such reports, bonds or written agreements as it deems necessary to properly monitor the actions of its delegate.

5.2    In addition, and not by way of limitation, the Trustee shall have any and all powers and duties concerning the investment, retention or sale of property held in trust as if it were absolute owner of the property, and no restrictions with regard to the property so held shall be implied, warranted or sustained by reason of this Agreement.

[*Id*.].

The parties' other agreements do not establish a confidential relationship as to the negotiation and resolution of a claim between Benedum and BNY Mellon, either. The custodian agreement simply establishes that BNY Mellon will hold certain funds on Benedum's behalf and will "invest, sell and reinvest only upon [Benedum's] directions." [ECF 33-1]. And the settlement agreement does not suggest that the parties were in some type of confidential relationship during the negotiations. *See generally* [ECF 25]. To the contrary, the settlement agreement says that Benedum was not being advised by BNY Mellon during their negotiation. [*Id.* at § 4 (Benedum "represents, warrants and agrees" that "it is executing this Agreement freely and voluntarily, and is doing so after obtaining and receiving advice thereon from its … legal counsel.")].

In sum, these agreements define the parameters of the parties' confidential relationship. They make clear that the confidential relationship extended to the investor-client relationship and all related investment

activities.  But there is nothing in these agreements that defines the scope of the parties' relationship so broadly as to sweep in a situation where BNY Mellon and Benedum were acting as adversaries during settlement negotiations over possible litigation.

Beyond the agreements, Pennsylvania law does not support finding that the parties had a confidential relationship in this context.  "A confidential relationship exists when one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other."  *Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*, 373 F. Supp. 3d 567, 602 (W.D. Pa. 2019) (Fischer, J.) (cleaned up).  Put simply, a confidential relationship requires that the parties not be on "equal terms."  *See Basile*, 777 A.2d at 101.  That means confidential fiduciary relationships do not exist between parties to an "arms-length" contract.  *Fleming Steel*, 373 F. Supp. 3d at 603.

When negotiating the settlement agreement, Benedum and BNY Mellon were equals.  Benedum is a sophisticated entity with substantial assets, not an uninitiated individual investor.  [ECF 33, ¶ 2 (alleging that Benedum "controls over $380 million in assets")].  Separate counsel represented Benedum during the parties' negotiations.  [ECF 33, ¶¶ 26, 34-35].  In fact, according to Benedum, all of the alleged "misrepresentations" were made by BNY Mellon's counsel to Benedum's counsel.[1]  [*Id.* at ¶¶ 34-35].  Benedum has acknowledged that its counsel was the only one advising Benedum as to the

---

[1] That Benedum alleges that in-house counsel for BNY Mellon made the misrepresentations adds another layer of complexity.  BNY Mellon's attorney had to act in the best interests of BNY Mellon.  But how could counsel do so if it was simultaneously required to act in Benedum's best interests as well?

settlement, and that Benedum acted independently during that process. [ECF 25, § 4]. The presence of separate counsel, and counsel's primary role in handling the negotiation, is critical to the Court's analysis because it helped insulate the parties' negotiations from the type of "overmastering dominance," or "weakness, dependence or justifiable trust" that characterize a confidential relationship. *Fleming*, 373 F. Supp. 3d at 602 (cleaned up). Parties who completely trust each other do not typically hire lawyers to do their talking for them.

Moreover, the Pennsylvania Probate, Fiduciaries, and Estates Code, which the parties incorporated by reference in the Trust Agreement as part of BNY Mellon's duties, does not treat the context of a settlement negotiation as creating a confidential relationship. Indeed, that code authorizes fiduciaries to resolve disputes with their beneficiaries, and places no limitations on a fiduciary's conduct during dispute resolution. *See* 20 Pa. Cons. Stat. Ann. § 7710.1(b) ("[A]ll beneficiaries and trustees of a trust may enter into a binding nonjudicial settlement agreement with respect to any matter involving the trust."). The import of the code is that the same rules that govern any arm's-length settlement apply when fiduciaries are negotiating settlement agreements. *See Testamentary Tr. of Conti*, 41 Pa. D. & C.5th 134 (Pa. Ct. Com. Pl. 2014) ("Under § 7710.1, the parties are free to enter into [] nonjudicial settlement agreements. The intent of this section is to give all beneficiaries and trustees flexibility in the administration of certain trust matters.").

There is no question that Benedum and BNY Mellon had a confidential fiduciary relationship in the context of BNY Mellon's investment of Benedum's funds. But as the above principles show, that same confidentiality, trust, and overmastering influence did not extend to the separate context of the parties' settlement negotiation at issue here.

Instructive in this regard is the Third Circuit's decision in *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604 (3d Cir. 1995). There, the Third Circuit considered a non-disclosure fraud claim in which the plaintiff asserted that the defendant had a duty to speak. The Third Circuit, applying Pennsylvania law, found that the existence of a confidential relationship between the parties can create a duty to speak. That said, the Third Circuit held that such a duty did not exist "where the two parties are sophisticated business entities, with equal and ample access to legal representation [because] superior information and better business acumen are legitimate advantages, which lead to no liability." *Id.* (cleaned up).

This case is similar, though perhaps even less of a close call than *Duquesne Light*. Not only did BNY Mellon and Benedum have "access to legal representation," they were, in fact, represented by legal counsel who acted on their behalf during the very conduct that gave rise to the misrepresentation claims in the case.

Additionally, though not binding, the Court finds persuasive a factually similar case involving a dispute between a law firm and its corporate clients. *See Fulbright & Jaworski, LLP v. Mariner Health Care, Inc.*, No. 05-1127, 2006 WL 4007923 (W.D. Tex. May 22, 2006).

There, the parties had a dispute over the law firm's fees and negotiated a settlement that obligated the clients to pay over $2 million in several installments. *Id.* at *2-4. The clients later challenged the settlement, claiming that Fulbright breached its fiduciary duties because the fees and bills did not reflect "all just and lawful offsets," were "unjustifiably inflated," included "unreasonable and unnecessary time entries," or were "unreasonable or excessive." *Id.* at *11. The court entered summary judgment in the law firm's favor on the clients' breach-of-fiduciary-duty claim.

Key to the court's decision was that the clients were represented by their own attorney and that the law firm fully disclosed the basis for its fees. *Id.* at *12. The court held that to find a breach of fiduciary duty under these circumstances "could transform every similar fee agreement freely negotiated by the parties into a question of breach of fiduciary duty." *Id.*

The same goes here. Adopting Benedum's view would have far-reaching consequences for all fiduciary relationships in Pennsylvania. If the Court were to accept Benedum's position, it would substantially hamstring a fiduciary's ability to negotiate a resolution to any dispute that may arise with its beneficiary. That would, in turn, eviscerate any incentive for the fiduciary to engage in these discussions and would undermine the "strong judicial policy in favor of the voluntary settlement of lawsuits." *Colella v. Univ. of Pittsburgh*, 569 F. Supp. 2d 525, 530 (W.D. Pa. 2008) (Schwab, J.) (citation omitted).

Benedum may wonder: "How can Benedum and BNY Mellon have a confidential relationship in the investment context, but that suddenly changes when they become adversaries?" The Third Circuit has made clear that the scope of the relationship matters because only breaches within the specific scope of a confidential relationship state a fiduciary-duty claim. *See Dinger*, 82 F. App'x at 265 (party has fiduciary duties only for "all matters for which he or she was employed."). The scope of the parties' relationship here simply did not extend to the separate adversarial context.

Consider this more common example. An attorney represents a client. For purposes of the engagement, they are in a confidential relationship. But the client later sues the attorney for malpractice. They are now each represented by separate counsel and negotiate a resolution of the malpractice claim. In that adversarial context, they are not in a confidential relationship as that is beyond the scope of their confidential attorney-client relationship.

And in the adversarial setting, there is nothing to otherwise suggest "an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." This case is no different.

Thus, accepting all of Benedum's allegations in the second amended complaint as true, as the Court must do, the facts and circumstances of the parties' relationship during the arms'-length settlement negotiations do not suggest that it was one marked by any of the typical characteristics of a confidential relationship. Without such a confidential relationship, no fiduciary duties applied and, as a matter of law, there can be no breach of those non-existent duties.

All that said, there are two qualifications to note.

First, the contours of a confidential relationship may not be clear in every case. And whether the alleged breaches occurred within the scope of a confidential relationship may oftentimes be less clear. This is why Pennsylvania law teaches that there is no "catalogue of specific circumstances" that provides a definition as to every confidential relationship. *See Estate of Scott*, 316 A.2d at 885. But, here, as pled in the second amended complaint, all of this is undisputedly clear.

Second, the Court's decision here should not be read to suggest that a contracting party can make a material misrepresentation and get away with it. Under such a circumstance, there may be a claim for fraud.[2] But the point is that if the misrepresentation is not made in the context of a confidential relationship, there cannot be a separate claim for breach of fiduciary duty.

In short, based on the parties' agreements and Pennsylvania law, as applied to the detailed allegations in the second amended complaint, the scope

---

[2] Benedum previously brought a fraud claim. The Court dismissed it as being barred by the parol evidence rule. *See Benedum*, 422 F. Supp. 3d at 947-48.

of Benedum and BNY Mellon's confidential relationship did not extend to their relationship as adversaries.

## II.   The parol evidence rule also bars Benedum's claim.

In its first amended complaint, Benedum brought a fraudulent-inducement claim.  The Court held that given the integration clause in the settlement agreement, Benedum's claim was barred by the parol evidence rule and dismissed it.  *Benedum*, 422 F. Supp. 3d at 948.  In reaching this decision, the Court noted that it was "unclear whether the integration clause would also bar Benedum's fiduciary duty claim that sounds in fraud[.]"  *Id.* at 948, n.3.  The Court didn't decide that issue because the parties didn't brief it.  Now that the issue is properly before the Court, the Court finds that Benedum's fiduciary-duty claim fails as a matter of law for this reason, as well.

"Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement."  *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 435, 436 (Pa. Super. Ct. 2004) (cleaned up).  "Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."[3]  *Id.* at 436-37 (citations omitted).  The rule covers not only oral misrepresentations but also the nondisclosure of material information.  *See Streiner v. Baker Residential of Pa., LLC*, No. 1253 EDA 2015, 2016 WL 3198162, at *4 n.5 (Pa. Super. Ct.

---

[3] One notable exception to this rule is that it "is not applied to a fraud in the execution of a contract claim."  *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 206 (2007).  As the Court already explained in its prior opinion, based on Benedum's pleadings, this is not such a case, and so this exception does not apply.  *Benedum*, 422 F. Supp. 3d at 946-47.

June 9, 2016) ("[T]he claim, based as it is on pre-contractual statements and nondisclosures allegedly made by Baker, would fall under the parol[] evidence rule[.]").

Benedum makes two arguments for why the parol evidence rule doesn't bar its claim: (1) the rule does not apply in the context of breach-of-fiduciary duty claims; and (2) the settlement agreement was not a fully integrated agreement.   Neither of these arguments is ultimately persuasive for the reasons discussed below.

### A.      The parol evidence rule can apply to fiduciary-duty claims.

Benedum first argues that while the parol evidence rule applies to fraud claims, it doesn't apply to breach-of-fiduciary-duty claims sounding in fraud. [ECF 47, pp. 3-4].  The parol evidence rule, however, is not so limited.  The core allegation here is that BNY Mellon made misrepresentations about the new fee structure that would apply to the parties' relationship, and those misrepresentations induced it to enter into the settlement agreement.  That is precisely the kind of claim—regardless of Benedum's label—the parol evidence rule is meant to prevent.

The purpose of the parol evidence rule is to "preserve the integrity of written agreements by refusing to permit the contracting parties to attempt to alter the import of their contract through the use of contemporaneous or prior oral declarations." *Am. Diabetes Ass'n v. Friskney Family Tr., LLC*, 177 F. Supp. 3d 855, 871 (E.D. Pa. 2016) (cleaned up).  The rule "seeks to achieve the related goals of ensuring that the contracting parties, whether as a result of miscommunication, poor memory, fraud, or perjury, will not vary the terms of their written undertakings, thereby reducing the potential for litigation."  11 WILLISTON ON CONTRACTS § 33:1 (4th ed.) (citations omitted).  "The stability of

our economic transactions and the contract law upon which they are founded demand strict application of the parol evidence rule." *Id.* (citation omitted).

It doesn't matter if the claim at issue is a "contract or tort claim;" the statements cannot be used as evidence. *See Ross v. Meyer*, No. 12-0998, 2014 WL 2800748, at *11 (E.D. Pa. June 19, 2014) ("Where the parol evidence rule will bar the admission of statements necessary to establish a contract or tort claim, a court may properly grant a motion to dismiss.") (citations omitted). Indeed, the Pennsylvania Supreme Court long ago cautioned that "[n]ow that [the parol evidence rule] has been well and wisely settled we will not permit it to be evaded and undermined by such [pleading] tactics." *Bardwell v. Willis Co.*, 100 A.2d 102, 104 (Pa. 1953).

As a result, the rule has been applied to bar not only fraud claims, but a variety of contract and other torts claims. *See, e.g.*, *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F. Supp. 2d 589, 595 (E.D. Pa. 1999) ("The difference between fraud and negligent misrepresentation, namely a state of mind requirement for the fraud claim, does not affect the rationale behind Pennsylvania's parol evidence rule.") (citations omitted); *Hena v. Vandegrift*, No. 18-762, 2020 WL 1158640, at *18 (W.D. Pa. Mar. 10, 2020) (Conti, J.) (rejecting "conclusory" argument that "the parol evidence rule does not apply to [plaintiff's] claims because they sound in trespass and not in assumpsit") (cleaned up); *Ross*, 2014 WL 2800748, at *11 ("[T]he rule applies to fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation claims.") (citation omitted); *Oldcastle Precast, Inc. v. VPMC, Ltd.*, No. 12-6270, 2013 WL 1952090, at *12 (E.D. Pa. May 13, 2013) ("Here, we agree with Defendants that the parol evidence rule would bar all evidence of any previous oral or written negotiations or agreements involving the same subject matter as the First Modification Agreement and, thus, further supports dismissal of

Oldcastle's claims against the VPMC Principals which include fraud, negligent misrepresentation, and civil conspiracy.").

While the parties could not point the Court to any cases applying Pennsylvania law in which a court examined the parol evidence rule in the context of a fiduciary-duty claim, Benedum has offered no persuasive reason why the rule ought not apply to such a claim.  And the Court cannot discern any reason, based on the rationale of the parol evidence rule, for disregarding that rule for fiduciary-duty claims.[4]

**B.    The settlement agreement was fully integrated and the parol evidence rule bars any statements that attempt to contradict or vary its terms.**

Benedum also argues that the parol evidence rule doesn't apply because the settlement agreement "was not fully integrated" and the parties "did not intend [it] to represent the entire contract."  [ECF 47, p. 4].  For the parol evidence to apply, "there must be a writing that represents the entire contract between the parties."  *Yocca*, 854 A.2d at 436 (cleaned up).

On this point, the Court notes, just as it did in its prior opinion, that the settlement agreement contains an integration clause.  *Benedum*, 422 F. Supp. 3d at 948.  That clause provides:

> **Entire Agreement**.  This Agreement and the Fee Schedule represent the full and complete agreement of the Parties with

---

[4] Indeed, courts from other jurisdictions have applied the parol evidence rule in this context.  *See, e.g.*, *Country Cove Dev. v. May*, 150 P.3d 288, 294-95 (Idaho 2006) (affirming use of parol evidence rule to bar "evidence of a collateral partnership agreement" that would have been needed to establish breach-of-fiduciary-duty claims); *Walhof & Co. v. MCB Holdings I, LLC*, No. A17-510, 2017 WL 5661589, at *3 (Minn. Ct. App. Nov. 27, 2017) (barring admission of document based on the parol evidence rule that purportedly established the fiduciary duties owed and finding that "the district court did not err by granting respondents' motion for judgment on the pleadings on appellants' breach-of-fiduciary-duty claim" as a result).

respect to the Claim, and supersede and replace any prior agreements relating thereto, whether oral or written.   Any amendment or modification of the Agreement must be in writing and executed by all Parties in order to be effective. There are no representations, warranties, promises, covenants or understandings relating to settlement of the Claim other than those expressly set forth in the Agreement and in the Fee Schedule.   For the avoidance of doubt, the Custodian Agreement date[d] July 18, 1977 and the Trust Agreement dated May 1, 1993 executed by Benedum and Mellon Bank, N.A. shall remain in full force and effect.

[ECF 25, ¶ 7].  This is significant because an "integration clause which states that a writing is meant to represent the parties' entire agreement is . . . a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution."   *Yocca*, 854 A.2d at 436 (citations omitted).   "The effect of an integration clause is to make the parol evidence rule particularly applicable." *Hart v. Arnold*, 884 A.2d 316, 341 (Pa. Super. Ct. 2005) (cleaned up).

Benedum's argument hinges on using the last sentence of the integration clause to negate the unambiguous meaning of the immediately preceding three sentences.  That is, according to Benedum, because that sentence refers to the custodian and trust agreements, the parties "specifically intended that the Settlement Agreement would not encompass, include and/or negate the custodial and trust agreements that gave rise to BNY Mellon's fiduciary duties."  [ECF 47, p.4].

That is true, but ultimately of no consequence.  Initially, contrary to Benedum's suggestion, the settlement agreement is a fully integrated agreement.  Based on the plain language of the integration clause, the parties intended the settlement agreement to be the entire agreement as to the terms addressed by it, including, specifically, the new fee schedule that would be in

place moving forward.  That is what the parties meant when they said: "There are no representations, warranties, promises, covenants or understandings relating to the settlement" other "than those expressly set forth in the [settlement agreement] and in the Fee Schedule."  [ECF 23-1. ¶ 7].

That fee schedule, and what it does or does not represent, is at the heart of this dispute.  *See* [ECF 33, ¶ 64 (alleging that BNY Mellon breached its fiduciary duties by "affirmatively misrepresenting BNY Mellon's pricing structure," "affirmatively representing that the custodial basis point charge of 1.5 could not be reduced further because it was already at its best pricing/cost," and "concealing the true pricing structure)].  And the settlement agreement is a fully integrated contract ***as to that term***.  Because the settlement agreement was fully integrated as to the new fee schedule, Benedum cannot use extra-contractual statements to explain that the fee schedule was supposed to represent "best pricing" or the "lowest" pricing BNY Mellon could charge.  *See, e.g.*, *Hena*, 2020 WL 1158640, at *11 (under the parol evidence rule, "evidence outside the four corners of a contract may not be introduced into evidence when a contract covers the subject matter of the evidence").

The last sentence of the integration clause confirms that "[f]or the avoidance of doubt," the settlement agreement would not be superseding or altering the parties' trust and custodian agreements.  The sentence simply acknowledges the validity of other long-standing agreements between the parties that concerned separate and unrelated subjects.  By acknowledging those agreements, however, the parties did not intend to undermine their clear expression that the settlement agreement was the entire agreement as to the resolution of their dispute and the new fee schedule.

But even crediting Benedum's reading of the integration clause, at best, the clause expresses an intent that the parties' entire agreement is

- 23 -

memorialized in the settlement agreement, trust agreement, and custodian agreement. Together, then, those are fully integrated. Under the parol evidence rule, Benedum still cannot introduce statements outside those agreements to vary any of the terms of those agreements.

Benedum asks: "How can the parole [sic] evidence rule eliminate BNY Mellon's fiduciary duty when the Settlement Agreement itself <u>specifically states that the other two agreements that give rise to the fiduciary duty – the custodial agreement and the trust agreement – are still in full force and effect</u>?!" [ECF 47, p. 4 (emphasis in original)]. To be clear, the parol evidence rule is not negating any fiduciary duties memorialized in the custodian and trust agreements (as is clear from the Court's above analysis of those agreements). Rather, the rule bars the admission of any statements that would contradict or attempt to "explain" the unambiguous fee schedule in the settlement agreement. Without those statements, there are no misrepresentations or omissions on which to base the fiduciary-duty claim that Benedum has pled in its second amended complaint. *See, e.g.*, *Waldschmidt v. NVR, Inc.*, No. 18-1372, 2018 WL 6433910, at *9 (W.D. Pa. Dec. 7, 2018) (Fischer, J.) ("The effect of the integration clause is dispositive. This Court cannot consider prior or contemporaneous representations regarding a matter covered by the Purchase Agreement."); *Butcher v. Gen. Motors Co.*, No. 14-00353, 2015 WL 867797, at *6 (W.D. Pa. Feb. 27, 2015) (Hornak, J.) (granting motion to dismiss where parol evidence rule barred "the consideration of the alleged misrepresentations that [plaintiff] necessarily relie[d] on for his claims of fraud").

In this respect, Benedum's argument is ill-fitting. Sometimes, a contracting party will point to a carve-out or exception in an integration clause to suggest that the agreement is partially integrated and to avoid the force of

the parol evidence rule.  But the party will do so because the carved-out agreement contains the statements, representations, or terms that the party seeks to enforce or to vary from the terms of the contract at issue.  *See, e.g.*, *DiPalma v. LaLiberte*, No. 95-8094, 1996 WL 480729, at *2 (E.D. Pa. Aug. 16, 1996) ("Although the contract at issue contains an integration clause, it appears that the contract was only partially integrated as the omission of 'Exhibit J' and any other reference to the $300,000 due at closing indicates that the parties did not intend the Agreement of Sale to constitute the only understanding regarding the remainder of the purchase price.").  Benedum's argument is different.  Benedum points to the alleged carve-outs (the trust and custodian agreements) but does not suggest that any of the terms of those agreements must be enforced over any term of the settlement agreement.

To put a finer point on it, any fiduciary duties that BNY Mellon may have owed are unaffected by the parol evidence rule.  What is more relevant, for purposes of the parol evidence rule, is that Benedum cannot introduce as evidence any of the statements it has alleged are the sole basis for its fiduciary-duty claim.  Since there can be no evidence to support Benedum's fiduciary-duty claim, as pled, it fails as a matter of law.

## II.   Benedum's claim will be dismissed with prejudice.

The last issue for the Court to decide is whether to dismiss the case with prejudice.  The Third Circuit has stated that "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable **or** futile."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (citation omitted) (emphasis added).  Here, any further amendment would be both inequitable and futile.

Further amendment would be inequitable because BNY Mellon has already expended significant time and energy responding to the three versions

of Benedum's complaint.   BNY Mellon's extensive efforts include:  briefing three motions to dismiss, twice meeting and conferring with Benedum to cure any pleading defects through agreement pursuant to this Court's internal practices and procedures, attending several status conferences, and participating in an oral argument.   To allow Benedum yet another chance to fix its claim would undoubtedly be inequitable to BNY Mellon.   *See Nelson v. Pennrose Mgmt. Reg'l*, No. 14-1063, 2015 WL 222384, at *3 (W.D. Pa. Jan. 14, 2015) (McVerry, J.) (dismissing case with prejudice where allowing a "third bite at the apple would not be equitable").

Not only that, but the problem with Benedum's complaint is not that there are facts missing from its pleading that it needs to flesh out.  The problem is that its fiduciary-duty claim lacks a legal basis.  Benedum cannot cure that kind of problem through additional factual development, and thus any amendment would be futile.   *See Adelman v. Jacobs*, No. 18-607, 2019 WL 1651612, at *6 (W.D. Pa. Apr. 17, 2019) (Fischer, J.) ("[T]he Court finds that any further amendment of these claims would be futile given the Court's analysis of the claims set forth above."); *Goldsmith v. Goldsmith*, No. 16-01362, 2017 WL 11471785, at *6 (W.D. Pa. Nov. 22, 2017) (Hornak, J.) ("[T]he Court concludes that in light of the many 'do overs' that Plaintiff has been given, any amendment would be futile.").

Finally, Benedum has not asked for amendment (either in its briefing or at oral argument), attached a proposed third amended complaint, or tried to explain how another pleading might help it adequately state a claim. Benedum's failure in this regard weighs heavily in favor of denying it another chance at amendment.   *See, e.g.*, *Davis v. Holder*, 994 F. Supp. 2d 719, 727 (W.D. Pa. 2014) (Gibson, J.) (dismissing with prejudice where "Davis has not filed a proposed amendment with the Court nor has he explained how he would

amend Count Three of the complaint to allege state action."); *Adelman*, 2019 WL 1651612, at *6 ("Plaintiffs already filed an amended pleading in this matter and have not affirmatively sought leave to file a second amended complaint nor supplied this Court with a proposed pleading such that leave to amend may be denied on these grounds as well.") (citations omitted).

Benedum has had three chances to plead a viable claim.   Further amendment would be inequitable and futile and, therefore, will not be authorized.

## **CONCLUSION**

For the reasons above, the Court will grant BNY Mellon's motion and dismiss the second amended complaint with prejudice.   An appropriate order, consistent with this opinion, follows.

DATED this 18th day of June, 2020.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge